J. Devlan Geddes
Benjamin J. Alke
GOETZ, BALDWIN & GEDDES, P.C.
35 North Grand
P.O. Box 6580
Bozeman, MT  59771-6580
Phone: (406) 587-0618
Fax:    (406) 587-5144
Email:  devlan@goetzlawfirm.com
         balke@goetzlawfirm.com

Attorneys for Relators


IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA,
BUTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL. FRANK M. REMBERT and MICHAEL R. PARADISE,<br><br>          Relators,<br><br>     v.<br><br>BOZEMAN DEACONESS HOSPITAL d/b/a BOZEMAN HEALTH, and DEACONESS-INTERCITY IMAGING, LLC d/b/a ADVANCED MEDICAL IMAGING,<br><br>          Defendants. | Case No. CV 15-80-BU-SEH<br><br><br>**RESPONSE TO MOTION TO DISMISS FOR LACK OF JURISDICTION** |

## **TABLE OF CONTENTS**

**Page No.**

TABLE OF AUTHORITIES ........................................................................iii

INTRODUCTION ............................................................................... 1

FACTUAL BACKGROUND ................................................................ 3

I.    THE COMPLAINT ALLEGES VIOLATIONS OF THE FALSE
       CLAIMS ACT AND ANTI-KICK BACK STATUTE .............................. 3

       A.    BDH refers patients to its own joint venture ............................. 3

       B.    BDH knowingly exchanged referrals for remuneration ............. 5

              1.    BDH requested that ICR pay cash for referrals .............. 5

              2.    BDH and ICR entered into an illegal side agreement
                   regarding referrals .......................................................... 6

              3.    BDH and ICR recognized that the Side Agreement was
                   illegal ............................................................................ 7

              4.    BDH referred the negotiated amount of patients to
                   AMI in accordance with the Side Agreement .................. 8

II.    THE STATE COURT LITIGATION CONCERNS THE
       TERMINATION OF RELATORS' EMPLOYMENT IN 2011
       AND SUBSEQUENT EVENTS .......................................................... 9

DISCUSSION .................................................................................. 12

I.    STANDARD OF REVIEW .............................................................. 12

       A.    Defendants' motion is another 12(b)(6) motion ....................... 12

i

B.      Under any rule, Defendants' motion should be denied ........... 14

II.      THE PURPOSE OF THE PUBLIC DISCLOSURE BAR ................... 15

III.     THE ELEMENTS OF THE PUBLIC DISCLOSURE BAR ................ 17

A.      Only documents in the categories specified by 31 U.S.C.
        § 3730(e)(4)(A) can be considered in a public
        disclosure analysis ................................................................. 18

B.      The "allegations and transactions" were not publicly
        disclosed ................................................................................ 20

        1.      The well-established formula shows that the public
                disclosure bar does not apply ........................................ 20

        2.      A monopoly is different from trading referrals for
                remuneration ................................................................. 23

IV.     RELATORS ARE ORIGINAL SOURCES ....................................... 26

CONCLUSION ........................................................................................... 28

CERTIFICATE OF COMPLIANCE ............................................................ 29

## <u>TABLE OF AUTHORITIES</u>

<u>Page No.</u>

<u>CASES</u>:

*Am. Civil Lib. Union v. Holder*,
   673 F.3d 245 (4th Cir. 2011)............................................................ 16

*Davis v. Wells Fargo*,
   824 F.3d 333 (3d Cir. 2016)............................................................ 14

*Graham County Soil and Water Conservation Dist. v.*
*U.S. ex rel. Wilson*,
   559 U.S. 280, 130 S.Ct. 1396 (2010).................................... 16, 17, 25

*Leveski v. ITT Educational Services, Inc.*,
   719 F.3d 818 (7th Cir. 2013)........................................................ 24,25

*MCI Comm.'s Serv.'s, Inc. v. City of Eugene, OR.*,
   359 Fed. App'x 692 (9th Cir. 2009)  ............................................... 14

*Malhota v. Steinberg*,
   770 F.3d 853 (9th Cir. 2014)........................................................... 18

*Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.*,
   966 F.Supp.2d 282 (S.D.N.Y. 2013) ............................................... 13

*Rockwell Int'l Corp. v. U.S.*,
   549 U.S. 457 (2007) ........................................................................ 12

*St. Clair v. City of Chico*,
   880 F.2d 199 (9th Cir. 1989)........................................................... 14

*Thornhill Pub. Co. v. Gen. Tel. & Electronics Corp.*,
   594 F.2d 730 (9th Cir. 1979)  ......................................................... 14

*U.S. ex rel. Absher v. Momence Meadows Nursing Cntr., Inc.*,
   764 F.3d 699 (7th Cir. 2014)........................................................... 13

*U.S. ex rel. Adv.'s for Basic Legal Equal., Inc. v. US. Bank, N.A.*,
  816 F.3d 428 (6th Cir. 2016) ............................................................ 13

*U.S. ex rel. Baltazar v. Warden*,
  635 F.3d 866 (7th Cir. 2011) ............................................................ 26

*U.S. ex rel. Bayarsky v. Brooks*,
  154 F.2d 344 (3d Cir. 1946) ............................................................ 16

*U.S. ex rel. Foundation Aiding the Elderly v. Horizon West,*
  265 F.3d 1011 (9th Cir. 2001) .................................................... *passim*

*U.S. ex rel. Fryberger v. Kiewit Pac. Co.*,
  No. 12-cv-02698-JST, 2013 WL 5770514
  (N.D. Cal. Oct. 24, 2013) ................................................................ 14

*U.S. ex rel. Hartpence v. Connetic Concepts*,
  792 F.3d 1121 (9th Cir. 2015) ................................................ 15, 27

*U.S. ex rel. Kraxberger v. Kan. City Power & Light Co.*,
  756 F.3d 1075 (8th Cir. 2014) ............................................................ 13

*U.S. ex rel. Marcus v. Hess*,
  317 U.S. 537, 63 S.Ct. 379 (1943) .................................................. 16

*U.S. ex rel. May v. Purdue Pharma, L.P.*,
  737 F.3d 908 (4th Cir. 2013) ............................................................ 13

*U.S. ex rel. Mateski v. Raytheon*,
  816 F.3d 565 (9th Cir. 2016) .................................................... *passim*

*U.S. ex rel. Moore & Co, P.A. v. Majestic Blue Fisheries, LLC*,
  812 F.3d 294 (3d Cir. 2016) ............................................................ 13

*U.S. ex rel. Osheroff v. Humana, Inc.*,
  776 F.3d 805 (11th Cir. 2015) ............................................................ 13

*U.S. ex rel. Savage v. CH2M Hill Plateau Remediation Co.*,

iv

No. 4::14-CV-5002-EFS, 2015 WL 5794357, at *6 (E.D. Wa.,
   Oct. 1, 2015)  ................................................................................. 13

*U.S. ex rel. Schumer v. Hughes Aircraft Co.,*
   63 F.3d 1512 (9th Cir. 1995)............................................................. 19

*U.S. ex rel. Springfield Terminal R. Co. v. Quinn,*
   14 F.3d 645 (D.C. Cir. 1994) .....................................................*passim*

## RULES:

F.R.Civ.P. Rule 12(b)(1) ............................................... 12, 14, 15
F.R.Civ.P.Rule 12(b)(6) ................................................ 12, 13, 14
Local Rule 7.1(d)(2)(D) ....................................................... 1

## UNITED STATES CODE:

31 U.S.C. § 3730(e)(4)(A)......................................................*passim*
31 U.S.C. § 3730(e)(4)(A) (2006) ............................................. 12
31 U.S.C. § 3730(e)(4)(A) (2010) ............................................. 12
31 U.S.C. § 3730(e)(4)(B) ............................................... 2, 26, 27
42 U.S.C. § 1320 a-7b(b)(1),(2) .............................................. 15
42 U.S.C. § 1320 a-7b(g)........................................................ 15

## OTHER CITATIONS:

Act of Mar. 2, 1862, ch. 67, 12 Stat. 696 ................................ 16
33 Cong. Globe 955 (1863) .............................................. 15, 16

## INTRODUCTION

Defendants' motion to dismiss misstates the law regarding public disclosure.[1]

"The public disclosure bar is intended to encourage suits by whistle-blowers with genuinely valuable information, while discouraging litigation by plaintiffs who have no significant information of their own to contribute." *U.S. ex rel. Mateski v. Raytheon*, 816 F.3d 565, 579 (9th Cir. 2016). The purpose of the bar is to prevent relators who discover fraud through publicly available information from filing parasitic *qui tam* actions. The public disclosure bar applies only when enough information exists in the public domain to expose the fraud, so that the government could presumably bring its own action under the False Claims Act ("FCA"). *U.S. ex rel. Springfield Terminal R. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994).

The public disclosure bar does not apply here. It applies only when: (1) a FCA claim is based upon information disclosed through one of public sources enumerated by statute; and (2) the relators are not original sources of the information. 31 U.S.C. § 3730(e)(4)(A).

---

[1] This is the first of two motions to dismiss filed by Defendants, who filed serial motions in violation of Local Rule 7.1(d)(2)(D).

1

This case is not based upon publicly disclosed information. The fraudulent scheme alleged in the Complaint is not substantially similar to any other litigation or public information. Defendants try to confuse the matter, however, by ignoring the requirements of the FCA and the Federal Rules of Civil Procedure. They cite documents that are not public sources under the FCA and then try to equate a monopoly with the exchange of referrals for remuneration prohibited by the Anti-Kickback Statute ("AKS"). Defendants do not even mention the test adopted by the Ninth Circuit for analyzing when the transactions underlying a FCA claim have been publicly disclosed, a test which demonstrates the public disclosure bar does not apply in this case.

"If and only if there has been a public disclosure," will a court then inquire into whether a relator is an "original source" within the meaning of 31 U.S.C. § 3730(e)(4)(B). *U.S. ex rel. Foundation Aiding the Elderly v. Horizon West,* 265 F.3d 1011, 1014 (9th Cir. 2001). Relators Frank Rembert and Michael Paradise ("Relators") qualify as original sources. The Complaint is based upon their own direct and independent knowledge and they voluntarily disclosed the information in their possession to the United States before filing this action.

Defendants' motion to dismiss should be denied.

2

## FACTUAL BACKGROUND

Comparing the allegations of the Complaint and the substance of the alleged public disclosures is the cornerstone of any public disclosure analysis. Thus, Relators will provide a brief background of the relevant allegations and documents.

## I.   THE COMPLAINT ALLEGES VIOLATIONS OF THE FALSE CLAIMS ACT AND ANTI-KICKBACK STATUTE.

### A.   BDH refers patients to its own joint venture.

Defendant Bozeman Deaconess Health Services ("BDH") is the only hospital in Bozeman. Doc. 1, ¶ 3. It has long enjoyed a monopoly as the sole hospital in the area. *Id.* In 2002, the local group of radiologists (Intercity Radiology, P.C. ("ICR")) considered opening a freestanding imaging center in Bozeman. *Id.* at ¶ 60. That center would have provided radiologic imaging services (such as CT and MR scans) on an outpatient basis. *Id.* at ¶ 61. BDH also offered these outpatient imaging services, and a freestanding imaging center would have competed directly with BDH. *Id.* The freestanding center would have been located off the BDH campus and would have offered significant cost savings and other advantages to patients in need of outpatient imaging services. *Id.* at ¶ 62.

BDH convinced ICR that, rather than open a freestanding imaging center away from the hospital, to locate the imaging center on BDH's

3

campus in the same building as BDH's existing imaging operations. *Id.* at ¶ 68. All of the patients at the imaging center would be referred by BDH. *Id.* at ¶ 71. In fact, BDH would not only refer patients to AMI, it would schedule AMI's patients. *Id.*

By promising to refer thousands of patients to the joint venture each year, BDH guaranteed that AMI would be profitable. *See id.* at ¶¶ 70, 84. Unlike a legitimate joint venture, the joint venture proposed by BDH presented zero risk. *Id.* at ¶ 70.

By guaranteeing the joint venture's profitability, BDH was able to negotiate a majority ownership interest. *Id.* at ¶ 78. In addition, ICR and its radiologists would be bound by a noncompetition clause, preventing them from participating in any other outpatient imaging center joint venture with any other group or outside entity for the life of AMI. *Id.*

BDH receives a kickback every time it refers a patient to AMI. To illustrate, if the BDH radiology department is full, a patient in need of a CT scan is referred to AMI. By scheduling that patient at AMI, BDH prevents that patient from going elsewhere and receives cash as a result of its referral because it owns the majority of AMI. The more referrals BDH makes to AMI, the more cash it receives.

**B.    BDH knowingly exchanged referrals for remuneration.**

**1.    BDH requested that ICR pay cash for referrals.**

BDH did not unwittingly exchange patient referrals for remuneration. BDH knowingly and willfully used referrals as a bargaining chip during negotiations regarding formation of the joint venture.

In January of 2005, after a valuation showed that the joint venture would be worth millions due to BDH's referrals, BDH approached ICR and asked for additional compensation. *See id.* at ¶¶ 81-87. BDH stated that because "the patients are the hospital's" ICR had to pay BDH cash directly. *Id.* at ¶ 86. BDH told ICR that refusal to pay for patient referrals was a "deal breaker." *Id.* at ¶ 87.

BDH and ICR knew that their conduct was illegal. An ICR power point presentation summarizing negotiations with BDH states that "[o]ur attorney believes that purchasing the revenue stream is illegal." *Id.* at ¶ 90. ICR communicated that to BDH and suggested that, at the very least, the parties should request an advisory opinion from the Office of Inspector General ("OIG") before moving forward. *Id.* at ¶ 92.[2]

---

[2] The Office of Inspector General of the U.S. Department of Health and Human Services issues advisory opinions to parties who are concerned about whether their proposed business arrangements may violate federal health care laws.

### 2.   BDH and ICR entered into an illegal side agreement regarding referrals.

ICR was not willing to opening pay BDH directly for referrals. Rather than restructuring AMI to comply with the law, however, BDH decided to have ICR pay less cash for fewer referrals. *Id.* at ¶ 93. CT scans are the most profitable imaging scan to BDH in terms of gross charges. *Id.* at ¶ 94. Instead of referring all outpatient CT scans to the joint venture as initially negotiated, BDH's revised plan was to refer fewer CT patients in order to lower ICR's contribution to the joint venture. *See id.* at ¶¶ 95-99.

BDH and ICR negotiated a side agreement ("Side Agreement") regarding the specific volume of CT referrals that BDH would send to the joint venture. *Id.* at ¶¶ 95-99, 102-103. A draft side agreement between BDH and the radiology group, sent to Relator Rembert, states that BDH would refer between 2,500 to 3,000 CT scans per year for the first three years (as opposed to the 6,000 CT scans that were initially proposed). *Id.* at ¶ 95; *see also* Doc. 1–7. Another draft of the Side Agreement provided that:

> The valuation assumes the number of CT scans performed in the OP imaging center for the first 2 years will be between 2500-3000.  This number assumes that there is no increase in scanning.  If the hospital CT scan is full, the number of CT exams may well exceed the number projected to move to the OP center.  **The intent is to ensure that all OP volume i[s] not shifted from the hospital to the OP center.**

Doc. 1-8 (emphasis added).

BDH's statement of intent is significant: the negotiations over volume had nothing to do with patient care and related only to BDH's desire to obtain the maximum amount of compensation for referrals, which is a clear violation of the AKS.

### 3. BDH and ICR recognized that the Side Agreement was illegal.

BDH knew the Side Agreement limiting referrals for CT in exchange for a lower contribution for ICR was illegal. *See id.* at ¶¶ 100-102. ICR's attorney communicated to the attorney for BDH that the proposed arrangement to limit the schedule in exchange for a lower contribution to the joint venture proved that BDH was providing referrals in exchange for remuneration in direct violation of the AKS. *Id.* at ¶ 100.

The Side Agreement linked ICR's contribution to the joint venture with the number of CT referrals from BDH. *Id.* at ¶ 104. The final draft of the Side Agreement states:

> The valuation assumes the number of CT scans performed in the OP imaging Center will average 1.4 scans per patient for 12 patients a day. This number assumes that there is no increase in the volume of CT scans.

Doc. 1-3. BDH and ICR knew that tying ICR's contributions to the volume of referrals and the resulting revenue stream was directly contrary to the AKS.

7

*Id.* at ¶ 106. They also decided to conceal their arrangement and chose not to request an advisory opinion from the OIG and excluded any reference to the Side Agreement from the final Operating Agreement for AMI. *Id.* at ¶ 109; *see* Doc. 1-11.

### 4.    BDH referred the negotiated amount of patients to AMI in accordance with the Side Agreement.

BDH used its control of scheduling at AMI[3] to follow through with the limitation on volume. *Id.* at ¶¶ 100, 105-106. AMI did not receive all the CT outpatient scans (over 6000 per year) as initially planned. *Id.* at ¶¶ 135-144. Instead, it received the number of CT patients set forth by the Side Agreement. *See e.g. id.* at ¶ 143; Doc. 1-23.

For example, AMI operating committee minutes from June of 2006, one year after formation of the joint venture, discuss the monthly limit on volume:

| Performance Improvement | Current Letter of agreement based on the valuation allows for 370 CT scans/month. Courtney recommended adding approximately 2 patients per day from July-December to regain lost volume from Jan-June and target 370/month for the remainder of the year. Don reported that imaging volumes are up 5% over last year but still less than budget. | CT volumes should achieve target of 370/month if patient demand is there. However, we will not attempt to recover lost volume from Jan-June. AMI will add the equivalent of 1 patient per day for the remainder of the year assuming overall |

---

[3] BDH also controls the hours at AMI. *See e.g.* Doc. 1-8. By preventing AMI from being open on evenings or weekends, it has another tool for manipulating the volume of scans at AMI.

*Id.* at ¶ 136; Doc. 1-17, p. 2. The "Current Letter of agreement" referenced by those minutes is the Side Agreement.[4]

## II.   THE STATE COURT LITIGATION CONCERNS THE TERMINATION OF RELATORS' EMPLOYMENT IN 2011 AND SUBSEQUENT EVENTS.

In January 2013, Relators filed a lawsuit in state court against BDH. That lawsuit related to the termination of their employment from ICR in 2011 and their subsequent effort to form a new radiology group to compete against the hospital. *See Complaint and Jury Demand* (Doc. 59-C) ("State Complaint"). The State Complaint alleges that BDH improperly pressured ICR to terminate Relators' employment (Doc 59-C*, ¶* 34) and then, following Relators' terminations, took steps to prevent Relators from competing against BDH. *See id.* at ¶¶ 38–45.

The State Complaint alleges claims for breach of contract, tortious interference with business relations, and unfair trade practices. *See id.* There are only two references to AMI in the State Complaint, in paragraphs 11 and 12.

> ICIG and BDH own a joint venture called Deaconess-Intercity Imaging, LLC ("joint venture"), which owns an imaging center…ICIG owns 22.5% of the joint venture. BDH owns the other 77.5% of the joint venture.

---

[4] 12 patients per day, at 1.4 scans per patient, converts to 370 patients each month.

Doc. 59-3, ¶¶ 11.

> Nearly all of the imaging services in Bozeman and the surrounding area are provided by two sources. One is the joint venture, the majority of which is owned by BDH.

*Id*. at ¶ 12. Essentially, the State Complaint alleges that AMI exists and BDH is the majority owner. Nothing more.

The Bozeman Daily Chronicle published an article based upon the state court lawsuit on February 1, 2013. The article also contains two references to AMI. It states:

> According to court documents, Rembert and Paradise were employees were employees and 22.5 shareholders in Deaconess-InterCity Imaging—a radiology facility and joint venture with the hospital. The hospital held the remaining majority shares.
> …
> The only radiology facilities in the Bozeman area are the joint venture, of which BDH holds the majority share, and the hospital itself, effectively creating "a monopoly in the sale of diagnostic imaging services," the lawsuit claims.

Doc. 59-4, p. 2, 3 ("Article")

The State Complaint and the Article do not contain the information alleged by the Complaint in this case. *Compare* Doc. 1 to Docs. 59-3 & 4. They do not even mention the term fraud, let alone contain the elements of the fraud alleged in the Complaint, such as:

- BDH referred patients to the joint venture in exchange for a majority ownership interest in AMI and a non-compete from the radiology group.

- All of AMI's patients were referred and scheduled by BDH.

- BDH calculated the monetary value of the patient referrals to be sent to AMI.

- BDH demanded that ICR pay cash for those referrals.

- BDH and ICR discussed that the arrangement violated the AKS.

- BDH and ICR negotiated the specific volume of CT and MR patients that BDH would refer to AMI.

- BDH and ICR intentionally avoided bringing the joint venture to the attention of the OIG.

- The capital contributions to AMI were tied to the volume of referrals.

- BDH followed through with the negotiated limitation on referrals.

Nevertheless, Defendants contend that this lawsuit should be dismissed, alleging that the substance of this lawsuit was publicly disclosed.

## DISCUSSION

I.   **STANDARD OF REVIEW.**

    A.   **Defendants' motion is another 12(b)(6) motion.**

Defendants' motion does not raise a jurisdictional issue and improperly invokes Rule 12(b)(1). Prior to 2010, the public disclosure bar provided that "[n]o court shall have jurisdiction over an action…based upon…public disclosure," 31 U.S.C. § 3730(e)(4)(A) (2006), prompting the Supreme Court to treat the bar as jurisdictional. *See Rockwell Int'l Corp. v. U.S.*, 549 U.S. 457, 460 (2007). When the statute was amended in 2010, however, Congress specifically removed that language. Rather than say that a prior public disclosure deprives a court of jurisdiction, the statute now says that "the court shall dismiss…." 31 U.S.C. § 3730(e)(4)(A) (2010).

While some courts have occasionally referred to the "jurisdictional" nature of the rule since the 2010 amendment, the ones that have specifically examined the meaning of the amendment have concluded that the public disclosure bar is no longer jurisdictional. As the Sixth Circuit recently explained:

> In this instance Congress removed the jurisdictional language, and the different language leads to a different meaning. The public disclosure bar is no longer jurisdictional, as **every other circuit to address the question** has concluded.

*U.S. ex rel. Adv.'s for Basic Legal Equal., Inc. v. US. Bank, N.A.*, 816 F.3d 428, 433 (6th Cir. 2016) (emphasis added) (citing *U.S. ex rel. Moore & Co, P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 299–300 (3d Cir. 2016); *U.S. ex rel. May v. Purdue Pharma, L.P.*, 737 F.3d 908, 916–17 (4th Cir. 2013); *U.S. ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 809–811 (11th Cir. 2015); *U.S. ex rel. Absher v. Momence Meadows Nursing Cntr., Inc.*, 764 F.3d 699, 705–06 (7th Cir. 2014); *U.S. ex rel. Kraxberger v. Kan. City Power & Light Co.*, 756 F.3d 1075, 1082 (8th Cir. 2014)); *see also Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.*, 966 F.Supp.2d 282, 293–94 (S.D.N.Y. 2013) (surveying lower court cases on this issue and concluding that Congress "deliberately removed" the statutory language such that the public disclosure bar does not compel a jurisdictional analysis but merely "provides a basis for dismissal.").

While the Ninth Circuit has not yet addressed this issue, BDH correctly acknowledges—in a footnote on the last page of its brief—that other district courts in this Circuit agree that the public disclosure bar is properly evaluated under Rule 12(b)(6) in post-2010 FCA cases. *See, e.g., U.S. ex rel. Savage v. CH2M Hill Plateau Remediation Co.*, No. 4::14-CV-5002-EFS, 2015 WL 5794357, at *6 (E.D. Wa., Oct. 1, 2015) (unreported) (treating the public disclosure bar as non-jurisdictional because "the 2010

version was in effect [when] the Complaint was filed."); *U.S. ex rel.*

*Fryberger v. Kiewit Pac. Co.*, No. 12-cv-02698-JST, 2013 WL 5770514, at

*5 (N.D. Cal. Oct. 24, 2013) (unreported) (rules should be assumed to be

non-jurisdictional absent a "clear statement" to the contrary, and finding

there was such a statement "but Congress deleted it.").

### B.    Under any rule, Defendants' motion should be denied.

Defendants' characterization of their motion as a 12(b)(1) is not

proper. Among other things, it provides a superficial excuse to file serial

motions, rather than raising all their arguments in a single 12(b)(6) motion.

It unfairly inverts the burden of proof, s*ee Davis v. Wells Fargo*, 824 F.3d

333, 348–49 (3d Cir. 2016), and permits the consideration of extraneous

evidence. *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989).

Finally, it invites the Court to decide this case without assuming the

truthfulness of the allegations of the complaint, *MCI Comm.'s Serv.'s, Inc. v.

City of Eugene, Or.*, 359 Fed. App'x 692, 697 (9th Cir. 2009), and without

even the more limited evidentiary safeguards Rule 56 affords. *Thornhill

Pub. Co. v. Gen. Tel. & Electronics Corp.*, 594 F.2d 730, 733 (9th Cir.

1979). In effect, BDH seeks a premature determination on the merits

without allowing any opportunity for discovery.

In any event, Defendants' motion should be denied even under Rule 12(b)(1).  The materials attached to Defendants' brief do not establish that the public disclosure bar applies.

## II.    THE PURPOSE OF THE PUBLIC DISCLOSURE BAR.

The AKS prohibits knowingly soliciting or receiving anything of value in exchange for or to induce referrals for services paid for by a government healthcare program. A person violates the AKS when they 1) knowingly and willfully, 2) solicit or receive, or offer or pay, remuneration, 3) in return for or to induce another to refer a patient for services that will be paid for with federal funds. 42 U.S.C. § 1320 a-7b(b)(1), (2). A violation of the AKS constitutes a violation of the FCA. 42 U.S.C. § 1320 a-7b(g).

A suit under the FCA is brought on behalf of the United States Government, which receives the majority of any amount recovered. "The FCA authorizes whistle-blowing private citizens to file suit after discovering that the federal government has been defrauded." *U. S. ex rel. Hartpence v. Connetic Concepts*, 792 F.3d 1121, 1123–1124 (9th Cir. 2015). As explained by Senator Jacob Howard, a leading sponsor of the FCA, it is premised upon the "old-fashion idea of holding out a temptation, and 'setting a rogue to catch a rogue.'" 33 Cong. Globe 955–56 (1863) (remarks

15

of Sen. Howard). [5] Thus, an FCA suit may be "brought and carried on *by any person*, as well for himself as for the United States." *Am. Civil Lib. Union v. Holder*, 673 F.3d 245, 259 (4th Cir. 2011) (emphasis original) (citing Act of Mar. 2, 1862, ch. 67, 12 Stat. 696, 698). "The intent of Congress could scarcely be stated more clearly." *U.S. ex rel. Bayarsky v. Brooks*, 154 F.2d 344, 346 (3d Cir. 1946).

As originally enacted, the FCA allowed a relator to bring a "*qui tam* action even if he discovered the fraud merely by reading information already in the public domain." *Id.*, 792 F.3d at 1124. However, following a notorious case where a relator discovered fraud by reading a federal criminal indictment, Congress amended the FCA to preclude any actions that were based on evidence or information already in the possession of the United States. *See Graham County Soil and Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 294 (2010) (citing *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379 (1943)).

Congress eventually amended the public disclosure provision of the FCA "in an effort to strike a balance between encouraging private citizens to root out fraud and stifling parasitic lawsuits such as the one in *Hess*."

---

[5] Relators are not the villains BDH's motion attempts to make them out to be, and that is not a relevant inquiry on a motion to dismiss. But, even if they were, that is not inconsistent with the purpose of the False Claims Act.

16

*Graham County*, 559 U.S. at 295. It seeks "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *Springfield Terminal*, 14 F.3d at 649; s*ee also Mateski*, 816 F.3d at 579. The public disclosure bar "must be analyzed in the context of these twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own." *Springfield Terminal*, 14 F.3d at 651.

## III.   THE ELEMENTS OF THE PUBLIC DISCLOSURE BAR.

The present text of the public disclosure bar states that the government shall dismiss an FCA suit:

> If substantially the same allegations or transactions as alleged in the action were publicly disclosed (i) in a federal criminal, civil, or administrative hearing in which the government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).[6]

---

[6] Under either the pre-2010 or post-2010 version of the FCA, the public disclosure bar is wholly inapplicable to this case.

"The public disclosure bar is triggered if three things are true: (1) the disclosure at issue occurred through on of the channels specified in the statute; (2) the disclosure was public; and (3) the relator's action is 'based upon' the allegations or transactions publicly disclosed." *Mateski*, 816 F.3d at 570 (citing *Malhota v. Steinberg*, 770 F.3d 853, 858 (9th Cir. 2014).

## A.   Only documents in the categories specified by 31 U.S.C. § 3730(e)(4)(A) can be considered in a public disclosure analysis.

The first two elements of the public disclosure bar deserve attention, because Defendants improperly rely on documents which are not public and are not relevant to the issues presented by their motion, such as depositions, discovery responses, expert disclosures, and a settlement agreement. *See generally*, Defendants' Brief.

The public disclosure bar only applies when information is contained within certain public fora specified by statute.[7] 31 U.S.C. § 3730(e)(4)(A). "Public disclosure can occur in one of only three categories of public fora: (1) in a 'criminal, civil, or administrative hearing;' (2) in a 'congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation;' or (3) in the news media." *U.S. ex rel. Foundation Aiding*, 265

---

[7] Even if those materials were relevant to the public disclosure analysis, the bar is still wholly inapplicable.

F.3d at 1014; *see also Mateski*, 816 F.3d at 570 (public disclosure bar triggered only if "the disclosure occurred through one of the channels specified in the statute").

Under either the pre-2010 or post-2010 version of the FCA, discovery materials cannot be considered in a public disclosure analysis. Under the current version, even state court lawsuits do not qualify as public disclosures, much less any discovery materials from those lawsuits. *See* 31 U.S.C. § 3730(e)(4)(A). Only lawsuits filed in federal court, where the government or its agent is a party qualify as a public disclosure.[8]

Under the pre-2010 version, the Ninth Circuit (and others) have unequivocally held that deposition transcripts and discovery materials relied upon by BDH cannot even be considered in a public disclosure analysis. Only discovery material that is "actually made public through filing" is disclosed, not discovery material exchanged between parties, which "is only *theoretically* available upon the public's request." *Springfield Terminal*, 14 F.3d at 652 (emphasis in original); *see U.S. ex rel. Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512, 1520 (9th Cir. 1995) ("We conclude that the

---

[8] The alleged public disclosures in this case occurred in 2013. *See* Doc. 59-3 &4. The state complaint does not even count as a public disclosure for conduct that occurred after 2010.

District of Columbia Circuit's distinction between *actual* and *theoretical* availability is persuasive") (emphasis in original) (overruled on other grounds).

The purpose of the bar is to prevent a relator from filing a *qui tam* based on public information that is known to the government. *See Springfield Terminal*, 14 F.3d at 654 (holding that the bar applies "only when enough information exists in the public domain to expose the fraudulent transaction"). Discovery materials exchanged between parties in litigation are not public. Otherwise, the public disclosure bar could be used to "prevent the utilization for enforcement purposes of allegations or transactions that may not otherwise come to the attention of the authorities" just like Defendants are trying to do here. *Springfield Terminal*, 14 F.3d at 651.

     **B.**    **The "allegations and transactions" were not publicly disclosed.**

          **1.**    **The well-established formula shows that the public disclosure bar does not apply.**

Defendants' brief does not mention the test to determine whether a lawsuit is based upon "allegations or transactions" that have been publicly disclosed.

> On the basis of plain meaning, and at the risk of the labored illustration, if X + Y = Z, Z represents the

20

> *allegation* of fraud and X and Y represents its
> essential elements. In order to disclose a fraudulent
> *transaction* publicly, the combination of X and Y must
> be revealed, from which readers or listeners may infer
> Z, *i.e.*, the conclusion that fraud has been committed.

*Springfield Terminal*, 14 F.3d at 654; *see also U.S. ex rel. Foundation*

*Aiding the Elderly v. Horizon West,* 265 F.3d 1011, 1015 (9th Cir. 2001)

(adopting the test set forth by the District of Columbia in the *Springfield*

*Terminal*).

Applied here, Z would be the *allegation* that BDH and AMI committed

Medicare and Medicaid fraud by bartering remuneration for referrals in

violation of the AKS and the FCA. Neither the State Complaint nor the

Article mention the term "fraud," let alone allege Medicare and Medicaid

fraud in violation of the Anti-Kickback statute. *See Foundation Aiding*, 265

F.3d at 1016 (holding that even general allegation of fraud in prior lawsuit

did not trigger the public disclosure bar and therefore "we conclude that this

action is not barred by the previous disclosure of the fraud at issue."").

Indeed, nowhere in either of these documents are the words "fraud,"

"remuneration," "kickback," "AKS," or "false claim"—the words that

comprise the fundamental allegations in this lawsuit. Clearly, the allegation

that BDH violated the FCA was not publicly disclosed.

Because the allegation of fraud was not publicly disclosed, there was no public disclosure, unless Defendants can show that the fraudulent transactions that comprise the fraud were in the public domain. To determine whether the *transaction* was publicly disclosed, it is necessary to analyze whether the critical elements of the fraudulent transaction (*i.e.* X + Y), themselves were made public. "Congress sought to prohibit *qui tam* actions *only* when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain." *Springfield Terminal*, 14 F.3d at 654 (emphasis in original). In other words, the elements of fraud must be disclosed so that a person reading the publicly disclosed information could infer that the FCA had been violated.

The critical elements of the fraud in this case relate to BDH knowingly exchanging referrals for remuneration. Among other things, BDH used referrals as a bargaining chip when negotiating the formation of the joint venture. It requested that ICR pay cash for referrals. It then negotiated a specific amount of patients that it would refer to AMI. BDH knew that its course of conduct was illegal, but decided to proceed anyway.  It entered into a Side Agreement which memorialized the negotiated volume of referrals and specifically decided against seeking an advisory opinion from the OIG.

22

The public disclosure bar clearly does not apply here. The critical elements of Defendants' kickback scheme are conspicuously missing from any information that was publicly disclosed before Relators filed this action. *See Foundation Aiding*, 265 F.3d at 1015. Allowing a public document which states that a joint venture exists to bar all FCA suits which identify specific instances of fraud arising from that joint venture would effectively repeal the False Claims Act. *See Springfield Terminal*, 14 F.3d at 654 ("To permit the bar to be invoked when the United States possesses only rumors while the *qui tam* plaintiff has evidence and information would be to permit the bar to repeal effectively most of the False Claims Act.").

## 2. A monopoly is different from trading referrals for remuneration.

Put another way, the fact that BDH has a monopoly in Bozeman did nothing to alert the government to the fact that BDH used referrals as a bargaining chip to obtain remuneration in violation of the AKS. The allegations in this case are not "substantially similar" to the prior litigation.

At the outset, Defendants' allegation that "Relators disclosed that Bozeman Health's formation of AMI was improper in the January 2013 complaint in the Bozeman Health Litigation" is false. *See* Defendants' Brief, pp. 15-16. The State Complaint does not discuss the formation of AMI at all, it only mentions that AMI exists.

23

But even if the State Complaint or Article did state that BDH improperly formed AMI in order to maintain a monopoly, the public disclosure bar would still not apply. A monopoly is entirely different from a kickback scheme. The fact that a monopoly existed does not allow the government to infer that BDH engaged in fraudulent conduct in violation of the FCA in order to maintain that monopoly. If it did, a defendant who had previously been accused of having a monopoly would be immune from any claims under the FCA. "Allowing a public document describing 'problems'— or even some generalized fraud in a massive project or across a swath of an industry—to bar all FCA suits identifying specific instances of fraud in that project or industry would deprive the government of information that could lead to recovery of misspent government funds and prevention of further fraud." *Mateski*, 816 F.3d at 577.

The Ninth Circuit has rejected attempts to lower the public disclosure bar based on general similarities with a prior disclosure, or mere overlapping subject matter. Even if the alleged prior disclosure "looks similar…at first blush[,]" *Mateski*, 816 F.3d at 576 (quoting *Leveski v. ITT Educational Services, Inc.*, 719 F.3d 818, 832 (7th Cir. 2013)), the court must look deeper. Courts cannot assess similarity "at the highest level of generality" and, in doing so, "wipe out qui tam suits that rest on genuinely

24

new and material information…." *Mateski*, 816 F.3d at 577 (quoting

*Leveski*, 719 F.2d at 831 (internal citations omitted)). That approach "is not

sound." *Id.* Rather than permit defendants to broad-brush the issues and

sweep in legitimate claims, the public disclosure bar requires a showing of

substantial similarity between the alleged prior disclosure and the specific

facts material to the FCA claim. This approach better effectuates the

purpose of the rule and strikes a balance between "encouraging private

persons to root out fraud and stifling parasitic lawsuits" *Mateski*, 816 F.3d at

577 (quoting *Graham County*, 559 U.S. at 295).

Moreover, even when prior lawsuits do contain allegations of fraud,

and even when those prior lawsuits allege claims under the FCA, the public

disclosure bar still does not prevent a lawsuit from moving forward that is

based on new and material information.

In *Leveski*, the relator filed a *qui tam* suit after a separate *qui tam*

action had already been filed against the same defendant. *Leveski*, 719

F.2d at 831. The two suits alleged similar fraudulent schemes. "To be sure,

Leveski's case looks similar to the *Graves* case at first blush. The relators

in both cases are former employees of ITT—and even held the same job

title. The relators in both cases also allege that ITT violated the incentive

compensation provision of the HEA." *Id.* at 832 (emphasis in original).

25

However, Leveski's complaint was based upon facts and information that had not previously been publicly disclosed. Therefore, "Leveski's case does rest on genuinely new and material information, and as a result, Leveski's allegations are not 'substantially similar to publicly disclosed allegations.'" *Id.* at 835; *see also U.S. ex rel. Baltazar v. Warden*, 635 F.3d 866, 869 (7th Cir. 2011) (public disclosure bar did not apply where relator "supplied vital facts that were not in the public domain").

## IV.    RELATORS ARE ORIGINAL SOURCES.

"If and only if there has been a public disclosure," will the court then inquire into whether a relator is an "original source" within the meaning of 31 U.S.C. § 3730(e)(4)(B). *Foundation Aiding*, 265 F.3d at 1014. An original source is not barred from bringing a lawsuit that has been publicly disclosed. 31 U.S.C. § 3730(e)(4)(A) ("The court shall dismiss an action or claim under this section…unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.").

Where an FCA claim has been publicly disclosed before a relator filed his complaint, the relator may still bring a claim under the FCA if he can show that "(1) he has direct and independent knowledge of the information on which the allegations in his court-filed complaint are based and (2) he

26

has voluntarily provided the information to the Government before filing his civil action." *U.S. ex rel Hartpence v. Kinetic Concepts*, 792 F.3d 1121, 1123-1124 (9th Cir. 2015); *see* 31 U.S.C. § 3730(e)(4)(B).[9]

Relators easily qualify as original sources. The allegations in the Complaint are based solely on their direct and independent knowledge. The Side Agreement and the drafts were sent to Relator Rembert, as well as emails and other documents which reveal the fraudulent scheme. Relators Rembert and Paradise were present at meetings which discussed the volume of referrals made by BDH to AMI. Obviously, Relators have direct and independent knowledge of the fraudulent scheme. *Springfield Terminal*, 14 F.3d at 656 ("We think it clear that, in light of the aims of the statute, that 'direct and independent knowledge of information on which the allegations are based' refers to direct and independent knowledge of any essential element of the underlying fraud transaction.").

Moreover, Relators voluntarily disclosed the information to the government before filing the Complaint. *See Hartpence*, 792 F.3d at 1123-1124; 31 U.S.C. § 3730(e)(4)(B). Relators provided a draft of the Complaint and of the written disclosure statement to the government, voluntarily, prior

---

[9] Relators qualify as original sources under both the pre-2010 and post-2010 versions of the FCA.

to filing the Complaint (and in addition to the Complaint and disclosure statement that were formally served on the government). Second Declaration of Frank Rembert, ¶9-10 (December 23, 2016).

## **CONCLUSION**

For the foregoing reasons, BDH's motion to dismiss should be denied.

DATED this 23rd day of December, 2016.


/s/ **Ben Alke**
J. Devlan Geddes
Benjamin J. Alke

GOETZ, BALDWIN & GEDDES, P.C.
*Attorneys for Relators*

28

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 7.1(d)(2) of the Local Rules of Procedure of the United States District Court for the District of Montana, the undersigned certifies that the word count calculated by Microsoft Word is less than 6,500 words (5,848) including footnotes and excluding the caption, Certificate of Compliance, and Certificate of Service.

DATED this 23rd day of December, 2016.

*/s/* ***Ben Alke***
J. Devlan Geddes
Benjamin J. Alke

GOETZ, BALDWIN & GEDDES, P.C.
*Attorneys for Relators*

29