J. Devlan Geddes
Benjamin J. Alke
Goetz, Baldwin & Geddes, P.C.
35 North Grand
P.O. Box 6580
Bozeman, MT 59771-6580
Tel:   (406) 587-0618
Fax:  (406) 587-5144
Email: balke@goetzlawfirm.com
Attorney for Relators

UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL. FRANK M. REMBERT AND MICHAEL R. PARADISE, <br> c/o Benjamin J. Alke <br> Goetz, Baldwin & Geddes, P.C. <br> 35 North Grand <br> P.O. Box 6580 <br> Bozeman, MT 59771-6580, <br><br> BRINGING THIS ACTION ON BEHALF OF THE UNITED STATES OF AMERICA <br> c/o Honorable Loretta E. Lynch <br> Attorney General of the United States <br> United States Department of Justice <br> 950 Pennsylvania Avenue, NW <br> Washington D.C. 20530-0001, <br><br> and <br><br> c/o Honorable Michael W. Cotter <br> United States Attorney for the District of Montana <br> United States Attorney's Office | Case No. CV 15-80-BU-SEH <br><br> **FIRST AMENDED COMPLAINT** |

901 Front Street, Suite 1100
Helena, MT 59626,

and

BRINGING THIS ACTION ON
BEHALF OF THE STATE OF
MONTANA
c/o Honorable Timothy Fox
Attorney General of Montana
215 N. Sanders, Third Floor
PO Box 201401
Helena, MT 59620,

   Plaintiff-Relators,

  v.

BOZEMAN HEALTH DEACONESS
HOSPITAL
c/o Gordon L. Davidson,
Registered Agent
915 Highland Blvd.
Bozeman, MT 59715,

and

BOZEMAN DEACONESS HEALTH
SERVICES D/B/A BOZEMAN
HEALTH,
c/o Gordon L. Davidson,
Registered Agent
915 Highland Blvd.
Bozeman, MT 59715,

and

DEACONESS-INTERCITY
IMAGING, LLC D/B/A ADVANCED
MEDICAL IMAGING,

c/o Albert P. Meier,
Registered Agent
925 Highland Blvd. Suite 1180
Bozeman, MT 59715,

             Defendants

For their First Amended Complaint against defendants Bozeman Health Deaconess Hospital and Bozeman Deaconess Health Services d/b/a Bozeman Health (together "BDH") and Deaconess-Intercity Imaging, LLC d/b/a Advanced Medical Imaging ("AMI") (together with BDH, "Defendants"), relators Frank M. Rembert and Michael R. Paradise (together, "Relators") state as follows:

## <u>NATURE OF THE ACTION</u>

1.      Relators bring this action under the federal False Claims Act, 31 U.S.C. § 3729, *et seq.* (the "FCA") and the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.*, as a result of Defendants' submission of false claims for payment to the United States of America and the State of Montana.

2.      BDH and AMI have engaged in a decade-long kickback scheme through which BDH traded patient referrals for valuable remuneration in knowing violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (the "AKS"), the FCA, and the Montana FCA.

3.     BDH, the only hospital in Gallatin County, has a monopoly on radiology services in Bozeman, Montana.   In 2004, BDH became concerned that it might lose this monopoly, because Intercity Radiology ("ICR"), the radiology group that practiced at BDH, was considering opening up a free-standing, non-hospital, outpatient imaging center, which would compete directly with BDH. This outpatient imaging center would have given Bozeman residents an enticing choice: to receive outpatient radiology services in a more convenient, comfortable, and competitively priced environment in downtown Bozeman, away from the hospital.

4.     To convince ICR to abandon this opportunity, BDH bribed it with guaranteed patient referrals.  These referrals were offered and given in exchange for valuable remuneration, including billings and cash distributions that would have been lost but for the illegal scheme.

5.     As a conduit for the exchange of money and referrals, BDH and ICR formed AMI, a joint venture, which would provide professional radiology services on BDH's campus.  There was no legitimate business reason to open the AMI joint venture—AMI would not provide any radiology services that BDH was not already providing, and would be located right downstairs from the BDH radiology department, in the same building.  AMI was and is a sham joint venture created for the sole purpose of exchanging

cash for referrals, and maintaining BDH's monopoly on radiology services in the Bozeman market.

6.      Through the illegal joint venture, BDH agreed to refer a fixed number of patients to AMI.  In return, BDH received valuable remuneration: majority ownership and control in AMI, large cash distributions from AMI pursuant to its ownership interest, free services from ICR in the BDH radiology department, and non-compete agreements from the radiologists who would provide professional services at AMI.   This last piece of remuneration was critical, because it guaranteed that BDH would maintain its monopoly over radiology services in Gallatin County.

7.      BDH created AMI to sustain its monopoly by retaining patients that would otherwise have gone elsewhere for imaging services.  By co-opting ICR's plan to open its own diagnostic imaging center (that would have competed directly with BDH for patients, and offered an appealing alternative to patients) and then securing non-compete agreements from those radiologists when they agreed to the joint venture, BDH was able to avoid any competition and retain its stranglehold on local imaging services.

8.      As a result of this illegal kickback scheme, BDH and AMI have submitted millions of dollars of false or fraudulent claims for payment to Medicare, Medicaid, and other federal healthcare programs, and have

received reimbursement from Medicare, Medicaid, and other federal healthcare programs for those false or fraudulent claims.   When they submitted these claims, BDH and AMI knew that their conduct was unlawful, but still certified that they were in compliance with all applicable federal health care laws and regulations, including but not limited to the AKS and the FCA.

9.    BDH's and AMI's fraudulent activities have resulted in the knowing submission of false or fraudulent claims for which they received payment, and have resulted in damage to the United States Government and the State of Montana.   Relators bring this suit to recover these ill-gotten gains.

## PARTIES

10.    *Qui tam* relator Frank M. Rembert is a citizen and resident of the State of Montana, and brings this action for and in the name of the United States of America and the State of Montana.

11.    *Qui tam* relator Michael R. Paradise is a citizen and resident of the State of Ohio, and brings this action for and in the name of the United States of America and the State of Montana.

12.    As required under the FCA and the Montana FCA, Relators served the Attorney General of the United States, the United States

Attorney for the District of Montana, and the Montana Attorney General with a copy of the initial Complaint and a written disclosure of all material evidence and information related to the initial Complaint.

13.    Defendant Bozeman Health Deaconess Hospital is a Montana corporation with its principal place of business in Bozeman, Montana.

14.    Defendant Bozeman Deaconess Health Services d/b/a Bozeman Health is a Montana corporation with its principal place of business in Bozeman, Montana. It is the parent corporation of defendant Bozeman Health Deaconess Hospital. Defendant Bozeman Health Deaconess Hospital was incorporated as a subsidiary of Defendant Bozeman Deaconess Health Services in 2015. For convenience, Defendants Bozeman Health Deaconess Hospital and Bozeman Deaconess Health Services are collectively referred to herein as "BDH."

15.    Defendant Deaconess-Intercity Imaging LLC d/b/a AMI is a Montana limited liability company with its principal place of business in Bozeman, Montana.  AMI is a joint venture between BDH and Intercity Investment Group LLC ("ICIG"), in which BDH owns a 77.5% membership interest.  ICIG was created by ICR's radiologists to hold their investment interests.

## **JURISDICTION AND VENUE**

16.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, namely the False Claims Act, 31 U.S.C. § 3729 *et seq.*   The Court may exercise supplemental jurisdiction over the Montana FCA claims pursuant to 28 U.S.C. § 1367, as they form part of the same case or controversy as Relators' claims under the federal FCA.

17.    There has been no public disclosure of the allegations or transactions at issue here, as that term is defined in the FCA, 31 U.S.C. § 3730(e)(4)(A), or in the Montana FCA, Mont. Code Ann. § 17-8-403(5)(c). Furthermore, Relators are the original sources of the information in complaint, as that term is defined in the FCA, 31 U.S.C. § 3730(e)(4)(B), and in the Montana FCA, Mont. Code Ann. § 17-8-403(5)(c).

18.    Venue in this judicial district is appropriate pursuant to 28 U.S.C. § 1391(b)(1) and (2), because Defendants reside in this judicial district and because a substantial part of the events or omissions giving rise to these claims occurred in this judicial district.

19.    Venue in this judicial district is also appropriate pursuant to 31 U.S.C. § 3732(a), because Defendants reside and transact business in this

judicial district and because acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

## APPLICABLE LAWS AND REGULATIONS

### A.    The FCA

20.    Title 31, section 3729(a)(1) of the United States Code imposes liability of between $5,500 and $11,000 per false claim, "plus 3 times the amount of damages which the Government sustains" as a result of those false claims, on any person who

> (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

> (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.][1]

21.    The terms "false" and "fraudulent" are not defined by the FCA. Courts, however, have unanimously held that a claim is legally false when the entity submitting the claim certifies that it has complied with the laws,

---

[1] The Fraud Enforcement and Recovery Act (Pub. L. No. 111-21, 123 Stat. 1617 (May 20, 2009)) renumbered and reworded the FCA's liability provisions.  Prior to FERA, the FCA at 31 U.S.C. § 3729(a) imposed liability on any person who "(1) knowingly presents, or causes to be presented [to the United States Government] a false or fraudulent claim for payment or approval; [or] (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government[.]"  These changes are not material to Relators' claims.  Thus the conduct described below violates sections (a)(1) and (a)(2) of the pre-FERA FCA for the same reasons that it violates sections (a)(1)(A) and (a)(1)(B) of the post-FERA FCA.

regulations, or other rules that govern the submission and payment of the claim, when in fact the entity has not complied with those laws, regulations, or other rules.  This "false certification" can be either express or implied.

22.    The FCA, at 31 U.S.C. § 3729(b)(1)(A), defines "knowing" and "knowingly" as having actual knowledge of information, acting in deliberate ignorance of the truth or falsity of information, or acting in reckless disregard of the truth or falsity of information.

23.    The FCA, as stated at 31 U.S.C. § 3729(b)(1)(B), requires no proof of specific intent to defraud.

24.    A "claim" is defined at 31 U.S.C. § 3729(b)(2)(A) as

> any request or demand, whether under a contract or otherwise, for money or property [that]
>
> (i)    is presented to an officer, employee, or agent of the United States; or
>
> (ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(I) provides or has provided any portion of the money or property requested or demanded[.]

25.    A claim is "material" if it has "a natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

26.     Additionally, Montana has enacted its own version of the False

Claims Act that is substantially similar to the federal FCA.   *See* Mont. Code

Ann. § 17-8-401 through § 17-8-412.

## B.     The AKS

27.     Title 42, section 1320a-7b(b) of the United States Code makes

it a felony to

> (1)     knowingly and willfully solicit [] or receive [] any
> remuneration (including any kickback, bribe, or rebate)
> directly or indirectly, overtly or covertly, in cash or in
> kind—
>
> (A)     in return for referring an individual to a person for
> the furnishing or arranging for the furnishing of any
> item or service for which payment may be made in
> whole or in part under a Federal health care
> program
>
> * * *
>
> (2)     knowingly and willfully offer [] or pay [] any remuneration
> (including any kickback, bribe, or rebate) directly or
> indirectly, overtly or covertly, in cash or in kind to any
> person to induce such person—
>
> (A)     to refer an individual to a person for the furnishing
> or arranging for the furnishing of any item or service
> for which payment may be made in whole or in part
> under a Federal health care program[.]

28.     The AKS, essentially, prohibits knowingly soliciting or receiving

remuneration, which is commonly defined as anything of value, in

exchange for or to induce referrals for services paid for by Medicare and other Government health programs.

29.    In 2011, Congress amended the AKS to explicitly state that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of" the FCA.  42 U.S.C. § 1320a-7b(g).   This amendment codified the existing judicial consensus that AKS violations rendered claims false under the FCA.

30.    As part of the same 2011 amendments, Congress also clarified that "a person need not have actual knowledge of this section or specific intent to commit a violation of this section" in order to act knowingly and willfully.  42 U.S.C. § 1320a-7b(h).

## C.    The Medicare Program and Other Federally Funded Health Insurance Programs

31.    Medicare is a federal health insurance program created in 1965 by Title XVIII of the Social Security Act.  Medicare is the nation's largest health insurance program and covers individuals age 65 and older and certain categories of disabled individuals.  Individuals eligible for Medicare-reimbursed services are commonly referred to as "beneficiaries," while persons or entities rendering medical services are known as "providers."

32.    To enroll in Medicare, a provider must complete form CMS-855.  Hospitals such as BDH complete form CMS-855A, while clinics such as

AMI complete form CMS-855B.  At all times relevant to this action, BDH had completed and signed form CMS-855A and AMI had completed and signed form CMS-855B.

33.    Section 14 of both forms describes the "Penalties for Falsifying Information," which includes discussion of the FCA.   Both forms also include Section 15, which requires an authorized official to certify that they, among other things, "have read and understand the Penalties for Falsifying Information," that the provider agrees "to abide by the Medicare laws, regulations and program instructions," and that the provider "understand[s] that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare."

34.    Once enrolled, providers are eligible to request payment for services provided to Medicare beneficiaries.

35.    Medicare divides its covered services into different "parts." Relevant to this action, Part A "provides basic protection against the costs of hospital" care and generally covers the technical costs associated with use of the hospital's or facility's resources.  42 U.S.C. § 1395c.  Part B

provides coverage for, among other things, outpatient health care expenses and a physician's professional services.  42 U.S.C. § 1395j-1395w4.

36.   Relevant to the radiology services at issue in this case, a claim for Part A services includes the fee for use of the hospital's or facility's imaging equipment, such as a magnetic resonance imaging ("MRI") or computed tomography ("CT") machine, as well as the use of the hospital's or facility's physical space, nurses, technicians, and other resources.  A claim for Part B services includes the professional fee charged by the radiologist who reads and interprets the image and renders a report.

37.   To increase claims handling efficiency, the Secretary of Health & Human Services contracts with various Medicare Administrative Carriers ("MAC") who are responsible for administering both Part A and Part B claims.  When a claim is submitted to a MAC, the MAC processes the claim and pays it using federal funds.

38.   Providers make a claim for payment electronically using the ASC X12 837 claims process, or in some situations via a paper claim by filling out either form CMS-1450 for Part A claims (technical services) or CMS-1500 for Part B claims (physician services).  Regardless of how the

claim is submitted, the provider must certify that they have complied with all applicable Medicare laws and regulations.

39.   Additionally, at the end of the year institutional providers such as BDH and AMI are required to submit an annual cost report to the MAC. The cost report contains facility and utilization data about the provider, as well as the total Medicare costs and charge data.  Hospitals such as BDH submit their cost reports on form CMS-2552-96, while clinics such as AMI submit their cost reports on form CMS-2552-92.  At all times relevant to this action, BDH and AMI submitted and signed these cost reports.

40.   Regardless of which form is used, when submitting the cost report the provider must "certify that [it] is familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."

41.   Beyond Medicare, other health care programs exist that provide health benefits, directly or indirectly, through insurance or that are otherwise funded in whole or in part by the United States Government. These programs include military benefits through the TRICARE (formerly CHAMPUS) program, which is administered by the Defense Health Agency (formerly the Tricare Management Activity).

42.    State health care programs, also known as Medicaid, also qualify as federally funded health insurance programs.   Medicaid is a government health insurance program for low-income individuals that is jointly funded by the federal and state governments and is managed by the states.   Montana has elected to participate in the Medicaid program, and the Montana Department of Public Health and Human Services manages the Montana Medicaid program.

43.    The claims and payment processes for TRICARE and Montana Medicaid are substantially similar to the Medicare process.

## D.    **Joint Ventures**

44.    Created in 1976, the Office of Inspector General of the Department of Health and Human Services ("HHS-OIG") is tasked with identifying and eliminating fraud and abuse in HHS programs such as Medicare.    HHS-OIG does this through audits, inspections, and investigations of Medicare participants, as well as through publishing fraud and abuse alerts and compliance guidance for the healthcare industry.

45.    As early as 1989, HHS-OIG recognized that joint venture arrangements were being used to conceal patient referral compensation agreements that violated the AKS.   HHS-OIG thus issued a Special Fraud

Alert warning the healthcare community that any of the following features could indicate a suspect joint venture:

> a) the manner in which investors are selected, such as **if investors are chosen because they are in a position to generate referrals** or **if the joint venture tracks its referrals**;

> b) the business structure of the joint venture; such as **if one of the investors is already engaged in the same line of business as the joint venture**; and

> c) the financing and profit distributions; such as **disproportionately small capital investment amounts for referral sources and extraordinary returns on investment**,

*See* OIG-89-4, Special Fraud Alert: Joint Ventures (August 1989) (reprinted at 59 Fed. Reg. 65372, 65374) (emphasis added).

46.    To clarify the types of joint venture arrangements that may be permissible, HHS-OIG has promulgated investment interest "safe harbor" regulations at 42 C.F.R. § 1001.952(a)(2).  HHS-OIG stated that if a party could show strict compliance with all eight standards of the safe harbor, the joint venture would not violate the AKS.  Relevant to this complaint, three of these standards are:

> (a)    an investor in a position to make or influence referrals to the joint venture cannot own more than 40% of the value of the joint venture's investment interests;

> (b)    an investor in a position to make or influence referrals to the joint venture cannot be offered an investment interest related to the expected volume of its referrals; and

(c)   no more than 40% of the joint venture's gross revenues may come from referrals or business generated by investors.

47.   HHS-OIG reiterated and applied these considerations in two advisory opinions issued in 1997 (No. 97-5) and 2003 (No. 03-12), respectively.  Both opinions involved a hospital entering into a joint venture with a radiology group to open an outpatient imaging facility.

48.   Neither proposed arrangement satisfied the investment interest safe harbor regulations, because, in both cases, investors in a position to generate referrals owned more than 40% of the investment interests.

49.   However, HHS-OIG found that the risk of fraud and abuse was low, because, unlike the joint venture AMI, in both cases the respective hospitals took significant steps to reduce or eliminate their ability to direct or influence referrals.

50.   The hospital at issue in Advisory Opinion No. 03-12 certified that less than 10% of the joint venture's referrals would come from the hospital, and that the hospital would not track referrals or require its affiliated physicians to make referrals to the joint venture.

51.   And the hospital at issue in Advisory Opinion No. 97-5 went a step further and certified that its employed physicians would make **<u>no referrals</u>** at all to the joint venture.

52.    As is more fully explained below, the joint venture AMI is very different from these permissible joint ventures.  Like those joint ventures, BDH (and AMI) cannot avail itself of the investment interest safe harbor because BDH (which is in a position to make or influence referrals to AMI) owns more than 40% of AMI's investment interests, and more than 40% of AMI's gross revenues come from referrals generated by BDH.  But unlike the hospitals in the above Advisory Opinions that took proactive steps to limit their ability to direct or influence referrals, BDH makes **all of the patient referrals** to AMI (compared to 0-10% of the referrals coming from the hospital in the examples above), and those referrals are tracked carefully (conversely the hospitals in the examples above agreed not to track referrals or, in the case of the hospital at issue in Advisory Opinion No. 97-5, there were no referrals to track).

53.    HHS-OIG's most recent statement on this issue, contained in its Supplemental Compliance Program Guidance (70 Fed. Reg. 4858 (Jan. 31, 2005)), is in complete accord with the above.  HHS-OIG repeated that its "chief concern is that remuneration from a joint venture might be disguised payment for past or future referrals to the venture," and that 1) the manner in which participants are selected; 2) the manner in which the joint venture

is structured; and 3) the manner in which profits are distributed can all indicate a suspect and illegal arrangement.

54.   HHS-OIG warned hospitals contemplating a joint venture to "scrutinize the venture with care."  To reduce (but not eliminate) the risk of fraud and of committing an AKS violation, HHS-OIG advised hospitals to "at a minimum"

> (1)   bar employed physicians from referring to the joint venture;
>
> (2)   avoid exerting any pressure on or encouraging, "in any manner," affiliated medical staff to refer to the joint venture;
>
> (3)   memorialize the above policies in writing;
>
> (4)   not track referral volumes and sources;
>
> (5)   disclose the hospital's financial interest in the joint venture to patients; and
>
> (6)   require other participants in the joint venture to adopt similar measures.

55.   As described in greater detail below, the joint venture AMI was and is the exact type of joint venture that the HHS-OIG warned against. BDH participated because of its ability to generate referrals, BDH is already engaged in the same line of business as the joint venture, and BDH planned on (and realized) extraordinary returns on its investment. Furthermore BDH physicians are not barred from referring to AMI; they are

required to make referrals to AMI.  Referral volume is not only monitored, but is tracked carefully to ensure that BDH obtains the maximum amount of remuneration for the minimum amount of referrals.  Finally, patients are not informed that their care is being compromised to maximize Defendants' profits.

## FACTUAL AND LEGAL ALLEGATIONS

### A.   Overview of the Healthcare Market in Bozeman and Gallatin County

56.   BDH is the only hospital in Bozeman, Montana, and, in fact, in all of Gallatin County, which spans over 2,600 square miles.  As the sole hospital, BDH dominates the Bozeman and Gallatin County healthcare markets.  It directly employs the majority of the primary care physicians in the area, as well as all the oncologists, internists, cardiologists, urologists, pulmonologists, hospitalists, critical care physicians, rheumatologists, nephrologists, gastroenterologists, and infectious disease specialists.  Furthermore, BDH has exclusive contracts with nearly all of the hospital-based physician groups in the area.  There are very few area physicians who are not either employed or otherwise under contract with BDH.

57.   A "hospital-based" physician is a physician who traditionally practices only within the confines of a hospital and has no independent patient base of his or her own.  Anesthesiologists, pathologists, emergency

room physicians, and, relevant to this action, radiologists, are common examples of hospital-based physicians—these physicians typically do not have their own freestanding clinics, but instead operate entirely within a hospital and provide services to the hospital's patients.

58.    Because hospital-based physician groups practice within the hospital, hospitals often enter into exclusive service contracts with them.  In these exclusive service contracts, the hospital agrees to provide the clinical and administrative space, nursing and technical staff, and maintenance services, while the physician group agrees to provide professional services and some administrative services.

59.    Critically, in these exclusive service contracts, the hospital also agrees to give the hospital-based physician group the exclusive right to provide professional services at the hospital.  Ordinarily, a hospital cannot deny a physician privileges to practice medicine at the hospital for any reason other than the physician's ability to practice medicine.  But in the context of an exclusive contract with a hospital-based physician group, hospitals are permitted to condition a physician's privileges for specific areas/procedures on employment with the contracted physician group.  In this way, only physicians who are affiliated with the contracted group are permitted to provide those services covered by the exclusive contract.

60.    Since 2001, BDH has had an exclusive contract to provide radiology services with ICR (the local radiology group that co-owns AMI with BDH).   ICR is the only radiology group that operates in the Bozeman market.

## B.    In 2002, ICR Considered Opening Its Own Imaging Center to Compete with BDH

61.    In 2002, ICR considered opening a freestanding imaging center in Bozeman. ICR hired consultants to develop a business plan for the imaging center, discussed and identified potential locations, and considered what imaging services would be provided.

62.    This center would have provided MRI, CT, and ultrasound services on an outpatient basis.  BDH also offered these outpatient imaging services, and a freestanding imaging center such as the one considered by ICR would have competed directly with BDH's imaging department.

63.    The freestanding center would have been located off of the BDH campus, and would have offered significant cost savings and other advantages to patients in need of outpatient imaging services.    For example, it is easier for the patient to schedule an exam, because, unlike a hospital, there are no emergency room or inpatients.   The freestanding center would also have offered better office hours and faster service in a location that was more convenient for many patients.   For these reasons,

the freestanding radiology center would have taken patients and revenue away from BDH.

64.    The freestanding center would have charged lower rates because radiological services rendered in a hospital setting are typically more expensive than those offered in a freestanding clinic.  This is because the charge for the technical component of radiological services (*i.e.* the facility fee) is often higher in a hospital setting, because hospitals incur more facility or overhead costs. The existence of a freestanding center would also have reduced BDH's bargaining power with third party payors (insurance carriers) and likely resulted in lower reimbursement rates to BDH across the board.

65.    Moreover, BDH uses its monopoly power to charge higher rates for radiological services than other hospitals.  For example, a 2011 article in Smart Money magazine used Bozeman as an example of a community where the local hospital bought up the competition.  (Ex. 1)  The article observed that a chest X-ray at BDH costs 83% more than the state average. (*Id.* at p. 2).

**C.     BDH Intervened to Avoid Competition from ICR**

66.     Faced with the prospect of actual competition for imaging services, BDH became concerned about how the destruction of its monopoly would affect its profits.

67.     To protect its monopoly and the resultant profits, and without regard for the patients of Bozeman, BDH convinced ICR to abandon its plan to open a freestanding radiology clinic to meet the needs of the Bozeman community.

68.     BDH also took measures to ensure that its monopoly would be secured in perpetuity.  Specifically, BDH persuaded ICR to partner with BDH in a joint venture imaging center located at the hospital, and to give BDH a dominant controlling interest in that business venture.

69.     This joint venture, which would become AMI, would be owned jointly by BDH and ICR (through ICIG).   And instead of being a freestanding center away from the hospital, the center would be located on BDH's campus—in fact, in the same building as BDH's imaging operations.

70.     According to Defendants' plan (and directly contrary to HHS-OIG's 2005 compliance guidance), **all patients at the joint venture imaging center would be referred by BDH**.  For example, BDH intended

to refer 18,517 outpatients to the joint venture for imaging services just in the first year, and more patients in subsequent years.

Based on management representations, the Hospital will contribute business operations including approximately 18,517 outpatient imaging scans to the proposed venture (see page 16). Those procedures that were excluded include Ultrasound, Radiology and a large portion of the Hospital's MRI volume.

(Ex. 2, p. 5.)

71.    ICR agreed to partner with BDH because the proposed joint venture presented zero business risk.  BDH would provide a steady stream of referrals to the joint venture, which guaranteed that the joint venture would be extremely profitable.  The "extraordinary returns" that Defendants rightly anticipated are, under HHS-OIG's guidance, clear indicators of a suspect arrangement.

72.    BDH wanted to do more than just refer patients to AMI.  BDH also wanted to control scheduling of all patients at both AMI and BDH. For example, when a BDH physician, such as an oncologist or internist, orders an outpatient CT scan, the order would be (and, once the plan was implemented, is)sent to a scheduler at BDH, who is a non-physician BDH employee.  That scheduler then would decide whether to send the patient to the joint venture (AMI), or to perform the scan in BDH's imaging center. Pursuant to this arrangement (and again directly contrary to HHS-OIG guidance), and Defendant's referral agreement, BDH would track carefully the volume of referrals it sent to AMI, and the volume that it kept in-house.

73.   BDH further would control the referrals provided by its employed physicians because the employment contracts of those physicians essentially requires them to refer patients to BDH or its affiliated entities (AMI) for radiology procedures.

74.   The initial intent of the parties was that outpatient imaging would be provided at the joint venture.   That included MRI and CT. Further, BDH decided to move all of the mammography and dexa equipment from the BDH radiology department to AMI.

75.   BDH would still provide MRI and CT—the exact same services being offered by the joint venture—in the hospital radiology department. According to HHS-OIG's 1989 Special Fraud Alert and its 2005 Supplemental Compliance Guidance, the fact that a joint venture participant is already engaged in the same line of business as the joint venture is a hallmark of a suspect arrangement.

76.   BDH wanted to form the joint venture not to improve patient care, but because it wanted to prevent ICR from competing with the hospital, and because the joint venture was a way to continue receiving income (in the form of distributions from AMI) from the imaging services that would otherwise be lost if ICR broke up its monopoly with a freestanding radiology clinic.

**D.**   **BDH Required ICR to Give It an Oversized Ownership Interest and Non-Compete Agreements**

77.    After BDH convinced ICR to abandon its original plan and instead explore a joint venture, the parties outlined the basic structure of the deal.   David Monaghan, the practice administrator for ICR, and Liz Lewis, the Vice President-Operations of BDH, led the negotiations.

78.    By June 2004, the structure of the deal between BDH and ICR was in place.

79.    The key provisions of the agreement were that BDH would have majority ownership of the joint venture (77.5%) and that ICR and its radiologists would be bound by a non-competition clause, preventing them from participating in any other outpatient imaging center joint venture with any other group or outside entity for the life of the AMI joint venture. (Ex. 3). In other words, ICR was expressly precluded from opening the type of freestanding radiology imaging center that it had been considering.

80.    After reaching the June 2004 agreement on the basic structure of the joint venture, BDH and ICR also considered how to classify the joint venture to maximize Medicare reimbursements.   For example, on October 19, 2004, Monaghan sent an email to ICR's radiologists, including Relator Rembert, explaining the choice between classifying the joint venture as an independent diagnostic testing facility ("IDTF") or a provider-based facility

and attaching (at Lewis's direction) a financial analysis.   Because classifying the joint venture as an IDTF would lead to greater reimbursement from Medicare, Monaghan advocated designating the joint venture as an IDTF. (Ex. 4).

81.   After addressing the designation, on November 5, 2004 Monaghan emailed Lewis and noted that it was time to start "talking about the valuation." (Ex. 5).

**E.   In Addition to a Majority Interest and a Covenant Not to Compete, BDH Requested That ICR Pay Cash Directly to BDH for Patient Referrals**

82.   After agreeing to the ownership percentages and the non-compete, Lewis and BDH commissioned a valuation report from Value Management Group, LLC ("VMG") that she shared with ICR in late 2004 or early 2005.

83.   Monaghan and ICR were under the impression that the valuation would be used to determine the start-up capitalization costs. ICR thought the capitalization would then be split between BDH and ICR based on their ownership percentages.

84.   BDH had other ideas.   BDH used the valuation to calculate the dollar value of the referrals that it would make to AMI, because BDH wanted to be compensated for them.   The "Engagement Overview" of the

valuation report notes that BDH engaged VMG to provide a valuation analysis "of certain outpatient diagnostic imaging services performed at" BDH.  (Ex. 2 p. 3.)  The "Situational Analysis" goes on to plainly state that "[b]ased on management representations, [BDH] will contribute business operations including approximately 18,517 outpatient imaging scans to the proposed joint venture."  (*Id.* p. 5.)  BDH intended to refer all outpatients to AMI for MRI, CT, mammography, women's diagnostic, and dexa scans.

**NORMALIZED BASE YEAR ADJUSTMENTS - REVENUE**

|  | *Bozeman Deaconess - Imaging* | | | *Proposed JV* | | |
|---|---|---|---|---|---|---|
|  | *Scan Volume* | *Net Revenue* | *Net Revenue per scan* | *Scan Volume* | *Total Revenue* | *Net Revenue per scan* |
| MRI | 4,299 | 3,012,173 | 701 | 1,920 | 1,344,000 | 700 |
| Ultrasound | 8,950 | 1,625,973 | 182 | 0 | 0 | 0 |
| C.T. | 10,515 | 5,442,057 | 518 | 6,381 | 1,914,377 | 300 |
| Mammography | 5,647 | 278,473 | 49 | 5,647 | 423,514 | 75 |
| Radiology | 34,512 | 2,264,206 | 66 | 0 | 0 | 50 |
| Women's Diagnostic | 3,271 | 269,734 | 82 | 3,271 | 163,543 | 50 |
| Dexa Scans | 1,303 | 171,888 | 132 | 1,298 | 155,726 | 120 |
| Totals | 68,498 | $13,064,505 | $190.73 | 18,517 | $4,001,160 | $216.08 |

Source: Hospital revenue and activity reports.

*Revenue per scan information derived from industry and regional norms

(Ex. 2 at p. 16.)

85.    BDH calculated that the 18,517 outpatient referrals that it would provide to the joint venture would generate $4 million in net operating revenue in the first year. (*See id.*) VMG projected that AMI would exceed $4 million in net revenue in subsequent years based on increased annual referrals from BDH. (*Id.* at A-4.)

86.    Ultimately, VMG determined that the fair market value of BDH's referrals was $5.1 million. (*Id.* at p. 35, A-4)  That value was calculated after deducting AMI's operating expenses, which included payments to BDH for leasing employees and leasing office space (in the same building as the BDH radiology department).  VMG concluded that—after subtracting around $2.5 million for working capital and the purchase of new equipment—the initial value of AMI was between $2.5 and $2.7 million.  (*Id.* p. 4.) In other words, before AMI had even been formed, the company was worth millions due to BDH's projected referrals.

87.    On or about January 17, 2005, Lewis communicated to ICR that the valuation was also taking into account the cash flow, *i.e.*, the referral volume, which BDH would contribute to the joint venture.  As consideration for that contribution, BDH wanted ICR to pay the hospital 22.5% of the discounted cash flow projections—approximately $600,000—because "the patients are the hospital's" and ICR was buying this business.

88.    Lewis told ICR that refusal to pay for BDH's patient referrals was a "deal breaker."

## F.    ICR Raised Serious AKS Concerns with BDH's Proposal

89.    After BDH asked ICR to pay cash directly to BDH for referrals, ICR became concerned about the legality of the arrangement.

90.    For example, on or around February 16, 2005, ICR developed a PowerPoint presentation in which it noted that "[o]ur attorney believes that purchasing the revenue stream is illegal."

### Current Situation

- For the most part, the hospital is sticking to their position and story
  - They believe that the group knew of the valuation
  - That their lawyers still insists that the goodwill going concern value must be purchased
- Our attorney believes that purchasing the revenue stream is illegal
- The hospital is however working with us on a new clause in the agreement that spells out our beliefs of the volume that is going to the center in hopes that it may make the buy-in less expensive (I think).
  - We need to talk to Tom before giving them any data to determine if this request came from him and that he believes it will solve our problem
- We should avoid positional bargaining

(Ex. 6, p. 3.)

91.    This PowerPoint presentation was given to members and employees of ICR for the purpose of providing an update on AMI, including the status of ICR's negotiations with BDH.

92.    The presentation was followed by a February 22, 2005 meeting between Monaghan, Lewis, and BDH administration.   At that meeting,

Monaghan repeated ICR's concerns over the legal problems caused by BDH's proposed contribution of patient referrals to the joint venture, including that the AKS prevents any valuation of the referrals that BDH would make to AMI—exactly what BDH was proposing to do.

93.     Monaghan also communicated ICR's desire that, at the very least, BDH and ICR should request an advisory opinion from the OIG before moving forward. They never did.

## G.   BDH's Revised Valuation was Still Tied to Patient Referrals

94.     After ICR told BDH that its request to exchange cash for referrals violated the AKS, BDH could have heeded this warning, and restructured the valuation in a way that did not place a dollar value on patient referrals.  It didn't.  Instead, BDH's new plan was to have ICR pay less cash for fewer referrals.

95.     CT scans were the most profitable imaging scan to BDH in terms of gross charges by a significant margin.  (Ex. 2, p. 15.).

96.     Instead of referring approximately 6,000 CT scans to the joint venture per year (as the original valuation assumed (*see id.* at p. 16)), BDH's revised plan was to refer only between 2,500 to 3,000 CT scans per year for the first three years of the joint venture's operations.  (Ex. 7.)

97.   During March and April of 2005, BDH continued revising the assumptions underlying the VMG valuation report.

98.   Throughout these revisions, BDH repeatedly assigned value to the promised patient referrals.  (Ex. 8.)

99.   Previously, Defendants' plan was to send all outpatients to the joint venture.

100.  After ICR refused to pay as much for the referrals as BDH demanded, BDH limited the number of outpatient referrals that it would make to the joint venture "to ensure that all [outpatient] volume is not shifted from the hospital to the [outpatient] center." (*Id.*)

## H.   ICR Told BDH That a Limit on Volume Demonstrated That The Arrangement Was Illegal

101.  ICR continued to raise concerns about the valuation, noting that all BDH was proposing was to exchange less cash for fewer referrals. ICR's attorney, Tom Greeson, communicated to TJ Sullivan, the attorney for BDH, that the proposed arrangement to limit the schedule in exchange for a lower valuation proved that BDH was providing referrals in exchange for remuneration in direct violation of the AKS.

102.  BDH's new volume assumptions had the added benefit of allowing BDH to retain even more of its imaging business than it had

previously thought possible.  In other words, it further strengthened BDH's existing monopoly.

103.  ICR communicated to BDH that limiting referrals for CT scans to 12 patients per day was also illegal.  BDH was still proposing to refer patients to the joint venture in exchange for valuable remuneration: a cash contribution from ICR, an oversized ownership interest in the joint venture, non-compete agreements from the ICR radiologists, and future cash distributions that it would not receive without the arrangement.

I.   **Despite Being Warned That The Joint Venture Was Illegal, BDH Pushed Forward**

104.  On May 4, 2005, Lewis sent a letter to Relator Rembert "updat[ing] the assumptions we discussed at the April 21st Operating Committee."  (Ex. 3, p. 1.)

105.  Lewis's letter reflected an agreement "as of 4/05" that "[t]he valuation assumes the number of CT performed in the OP Imaging Center will average 1.4 scans per patient for 12 patients a day."  (*Id.*)  Lewis went on to explicitly state that "[t]hese assumptions are the basis for the valuation provided by" VMG and also that "[i]t is important that the parties understand that any deviations from the above assumptions may cause a change in the valuation terms."  (*Id.*).

106.  ICR, through Tom Greeson, reiterated its concerns to BDH about the valuation method, particularly Lewis's comment that changes in the volume assumptions would require a change in the valuation terms.

107.  That language regarding volume assumptions proved that ICR's contributions were tied to the volume of referrals from BDH and the resulting revenue stream **which is directly contrary to the AKS.**

108.  BDH approved the language even though it knew that the agreement was directly contrary to the AKS.

109.  ICR did not want to back out of the deal despite its concerns. ICR was more interested with moving forward with a profitable business venture with BDH, and further solidifying its position as the exclusive provider of professional radiology services in Bozeman, than it was with the legality of its arrangement with BDH.

110.  Despite knowing that the proposed joint venture was directly contrary to the AKS, BDH and ICR chose to move forward and create AMI, without requesting an advisory opinion from the OIG.

111.  The fact that requesting an advisory opinion was considered and rejected is reflected by Liz Lewis's letter of May 4, 2005, which states that if "an outside party requests an updated valuation, the Hospital understands that Intercity Investment Group may elect to seek an opinion

from the OIG as to whether the change in valuation constitutes a violation of any regulatory mandates at the time of the change."  (Ex. 3.)

112.  Two weeks later, on May 19, 2005, Monaghan emailed the group and said the joint venture agreement was "very near completion." Although he noted that the group had gotten "much of the language changed to protect us properly," the proforma attached to the email clearly showed the agreement to refer 12 patients per day for CT scans.  (Ex. 9, p. 5.)

113.  This anticipated demand for CT and MRI scans is in direct contrast to a February 2005 proforma that Monaghan sent to Relator Rembert, which based its demand analysis solely on market trends.  (Ex. 10, p. 4.)

114.  The difference in the anticipated scan volume meant decreased revenue projections for the joint venture, smaller distributions to ICR, and that BDH had to share less of its overall imaging business with the joint venture.

115.  The February 2005 proforma projected operational income to start at approximately $1.9 million in Year 1 and rise to $3.2 million in Year 5, with corresponding payouts to ICR of $596k in Year 1 up to $740k in Year 5.  (Ex. 10, p. 16 of 17.)

116.  The May 2005 proforma that included the agreement limiting referral volume, however, lowered these projections. (Ex. 9, p. 14 of 15.)

## J.    BDH and ICR Execute the Agreements

117.  On July 6, 2005, BDH and ICR, through ICIG, executed various agreements and formed the joint venture, AMI.

118.  Section 5.1 of the Operating Agreement provided that distributions, in proportion to membership percentages, would be made at least annually.  Section 5.3 provided for the same with respect to profits. (Ex 11, p. 11.)

119.  As BDH had insisted all along, Section 12.2 of the Operating Agreement contained a non-competition clause prohibiting ICR from participating, "directly or indirectly . . . through ownership or management in any business which provides the technical component in any outpatient imaging service within Gallatin County."  (*Id.* at p. 22.)

120.  Several other agreements were executed on the same day and incorporated by reference into the Operating Agreement.  (*Id.* at p. 13.)  All operated to reduce BDH's cost and involvement with AMI (other than simply referring patients to AMI and receiving distributions from AMI).

121.  ICR, through a Management Agreement with AMI, agreed to manage all of AMI's daily operations—such as obtaining licenses, providing executive management of business operations, maintaining accounting procedures and systems, negotiating provider agreements, maintaining patient files, preparing and filing tax returns, purchasing supplies, and billing—in exchange for a flat yearly fee of $134,243.  (Ex. 12, p. 7)

122.  AMI leased its non-clinical staff from BDH, and paid BDH "one hundred percent (100%) of the salary, wages, and bonuses paid to the Leased Employees, plus 26% for Leased Employees' fringe benefits and taxes and the cost of processing payroll, handling benefits and recruitment."  (Ex. 13, p. 3.)

123.  In January of 2008, an independent third party audit determined that the amount paid by AMI to BDH for lease of these employees was above fair market value.  (Ex. 14, p. 5)

124.  AMI and ICR also entered into a Professional Services Agreement in which AMI agreed to provide the facility, equipment, and staff and ICR agreed to provide professional radiology services and medical director services.  (Ex. 15, p. 2-8.)  With respect to billing, AMI would bill globally, meaning that both the technical Part A and professional Part B

components would be billed in AMI's name, and ICR would receive 23% of the net cash receipts of that global billing.  (*Id.* p. 8-9.)

125.  In 2008, the independent third party audit determined that 23% of the net cash receipts was below fair market value. (Ex. 14, p. 6)

**K.**    **AMI's Operations Resulted in Huge Returns for BDH**

126.  For BDH, AMI was a huge success.

127.  As is reflected in a May 2009 valuation report from VMG, AMI's gross charges in its first full year of operations (2006) were approximately $11.4 million.  (Ex. 16, p. 29.)  That number increased to $15.2 million in gross charges in 2008.  (*Id.*)  CT and MRI services comprised over 66% of these charges.  (*Id.*)

128.  These large volumes resulted in large cash distributions to BDH.  AMI's first distribution occurred in 2006.  For the first full year of operations AMI distributed a total of approximately $2.3 million, of which BDH received approximately $1.8 million pursuant to its 77.5% membership interest.  (Ex. 16, p. 7.)  For BDH, this was an incredible rate of return on its initial investment—**it recouped most if not all of its capital contribution in AMI in the first year of AMI's operation**.  Again, according to HHS-OIG's fraud alerts and compliance guidance, such a high rate of return indicates that the joint venture is suspect.

129. In 2007 and 2008, AMI distributed approximately $2.5 million and $2.6 million, respectively, which resulted in distributions to BDH of approximately $1.9 million and $2 million. This is money from imaging services that BDH would otherwise have lost if ICR had opened its own imaging center instead of forming AMI with BDH.

130. A significant portion of these funds came from Medicare. Although the precise dollar amount of all of the illegal claims is within AMI's custody, the May 2009 VMG report shows that Medicare was AMI's top payor. (*Id.* at p. 6.) Nearly 33% of all of AMI's gross charges (over $15 million in just 2008) are to Medicare. Additionally, approximately 3% of AMI's charges were to Montana Medicaid.

131. These lucrative returns for AMI and BDH were enhanced by deliberate overutilization of procedures at AMI, without regard for patient care. For example, there was a directive that unless otherwise specified, all MRI scans of the brain were to be done with and without IV contrast, which nearly doubled the cost of the exams. This is not customary in the practice of diagnostic radiology. Typically, most MRI brain scans are done without IV contrast; contrast is typically used only in cases where there is concern for infection, malignancy or in the postoperative state. Relator

Paradise, who is fellowship trained in MRI, questioned this inappropriate practice on multiple occasions.

132. Another example: AMI consistently performed almost every ultrasound guided breast biopsy with vacuum assistance, regardless of whether vacuum assistance was medically necessary, which also significantly increased the cost of the procedure and increased risk to the patients.   Relators Rembert and Paradise refused to adopt this practice.

133.  BDH also uses its control over the volume of referrals to AMI to extract other forms of remuneration.   To provide one example, ICR provides a free medical directorship to BDH in the hospital radiology department.

## L.   BDH Tracked and Controlled the Volume of Referrals to AMI

134. Although BDH was realizing significant profits from the joint venture, sending referrals to AMI still took some revenue away from BDH, because ICR received 22.5% of AMI's distributions.  BDH therefore took steps to track and tightly control the volume of referrals it sent to AMI, so BDH could keep the majority of the outpatient imaging business for itself.

135. As discussed above, BDH controls all patient scheduling for AMI.   All orders for outpatient imaging services are sent to BDH's scheduling department.   The scheduling department decides whether to

send the patient to BDH's own radiology department, or to refer the patient to AMI. By controlling, scheduling, and tracking which patients are kept in-house and which are sent to AMI (something that HHS-OIG has warned hospitals not to do), BDH ensures that only a predetermined number of patients are sent to AMI.

136.  For example, BDH strictly limited the amount of CT referrals that it provided to AMI each month. Consistent with the May 4, 2005, letter from Lewis to Relator Rembert, BDH capped the volume of CT referrals to AMI at 370 per month. (*See* Exs. 3 and 17, p. 2.)

137.  The tight control over referrals to AMI is reflected in AMI's operating committee minutes from June 2006. Hospital executives, including the CEO of BDH (John Nordwick), the COO of BDH (Liz Lewis), and the CFO of BDH (Gordon Davidson) were all present at that meeting, which discussed the specific limit of 370 CT referrals per month to AMI. (Ex. 17, p. 2.)

138.  BDH's control and tracking of referral volume is also reflected in ICR's meeting minutes. For example, ICR's July 13, 2006 meeting minutes noted "some debate about volume expectations [but that] BDH clearly refers to the Valuation Agreement for approved targets[.]" (Ex. 18 p. 1.)

139.  In another meeting ICR had with John Nordwick, BDH "reiterated that all OP business cannot go to AMI without harming the hospital."  (Ex. 19 p. 1.)  Based on these statements, ICR concluded that it might take "several more years before we are truly seen as partners instead of competitors."  (*Id.*)

140.  In 2010, BDH refused to increase referrals to AMI even though that refusal decreased the level of care provided to patients.

141.  At the August 3, 2010 ICR meeting, ICR discussed a needed upgrade to the CT scanner at AMI, which used outdated technology, often failed, and was less effective than newer models.  The group planned to discuss this issue with BDH and Lewis.  (Ex. 20, p. 1.)  The group discussed the issue again at an August 17th meeting, noting that upgrading to the current CT technology was the "#1 priority for 2010."  (Ex. 21, p. 1.)

142.  To pay for a new CT scanner, AMI needed increased revenue. The only way to get more revenue was to do more scans, which meant that BDH would have to refer more patients to AMI.

143.  But at the September 21, 2010 meeting, the group discussed BDH's and Lewis's response that "the hospital is reluctant to allow any more volume shift to AMI" when 2 to 3 more patients per day were needed to offset the cost.  (Ex. 22, p. 1.)

144.  The proforma for the new CT developed by AMI in 2010 clearly shows BDH's volume restrictions.  From 2005 to 2010, the annual number of CT scans performed and read by AMI was remarkably consistent.  Each year, AMI performed approximately 4,500 CT scans (prorated in 2005 to account for AMI's half year of operations).  The amount of CT scans performed in BDH's radiology department, however, increased nearly 36% over that timeframe.  The total number of CT scans ordered increased from 11,833 in 2005 to 14,151 in 2010—yet AMI did not see a corresponding increase in the number of CT scans it was performing.  (Ex. 23, p. 1.)

145.  Instead, BDH continued to limit the number of scans referred to AMI and keep the increased overall volume for itself.  This, of course, is exactly why BDH wanted to form and control AMI in the first place.  It was a way to prevent the loss of patients that would have resulted from ICR opening its own outpatient imaging facility, and to maximize its own revenue.

146. In 2008, to further ensure that BDH did not lose any business, BDH directed AMI to hire a "patient care navigator."  Among other things, this patient care navigator was tasked with referring breast cancer patients back to BDH (since all mammography equipment was located at AMI).  BDH tracked the patient referrals it received from the breast care

coordinator.  Moreover, the patient care navigator was a paid employee of AMI, but was supervised by a physician employed by BDH.

147.  BDH and AMI have continued this relationship to the present. BDH still controls and refers a preset number of patients to AMI, for the express purpose of inducing remuneration.  BDH still receives remuneration from AMI, through large cash distributions from its 77.5% membership interest in AMI, as well as the value conferred by the non-compete agreements, which ensure BDH's monopoly.  AMI still bills Medicare for nearly 33% of its gross revenues.

## M.   BDH and AMI Violated the Anti-Kickback Statute

148.  The AKS prohibits the knowing or willful solicitation, receipt, offer, or payment of remuneration in return for or to induce the referral of services for which payment may be made by a federal health care program.

149.  Through their actions, BDH and AMI violated the AKS.

150.  BDH solicited and received remuneration from AMI in the form of an oversized membership interest (77.5%) in AMI, large distributions from AMI of approximately $2 million per year, free services from ICR at BDH, and a non-compete agreement in the AMI Operating Agreement. AMI, in turn, offered and paid this remuneration to BDH.

151.  BDH solicited and received this remuneration from AMI in exchange for referring patients to AMI.   AMI offered and paid this remuneration to BDH in exchange for the referrals from BDH.  The entire purpose of the joint venture AMI was and is to capture billings for radiology services that BDH would have otherwise lost if ICR had opened its own outpatient imaging center.  BDH agreed to minimize its losses by giving the joint venture a cut of its patient base in return for allowing BDH to keep the lion's share of the revenues.

152.  This purpose is evidenced by the direct link between the valuations of AMI and the volume of patients BDH was agreeing to refer.  It is also evident in the oversized membership interest and distributions BDH received.  It is also evident in BDH's subsequent resistance to permit any additional referral volume to go to AMI.

153.  Payment for these referred services was made by a federal health care program, namely Medicare, TRICARE, and Montana Medicaid.

154.  While the specific dates and dollar amounts of the false claims are solely within BDH's and AMI's custody, Relators have myriad indicia of reliability that false claims were submitted to the United States pursuant to the fraudulent scheme outlined above:

a. First, the 2009 VMG valuation report reviewed AMI's financial records and noted that nearly 33% of AMI's gross charges were to Medicare and 3% were to Montana Medicaid.   Thus, a significant portion of AMI's revenue and the resulting distributions to BDH were paid for with federal funds, and stem from claims for payment that are subject to the AKS.

b. The false claims for radiology services were submitted by both AMI and BDH, beginning on July 6, 2005, and continuing to the present.

c. These false claims included billings for radiology services, including but not limited to: CT of the head, neck, chest, abdomen, pelvis, spine and extremities and joints; MRI of the brain, face, neck, chest, abdomen, pelvis, breast, spine, extremities and joints; MRI Angiography; MRI Venography; CT Angiography; Cardiac MRI; diagnostic and screening mammography; breast ultrasound; bone densitometry; and breast biopsy with imaging guidance (CT, MRI, ultrasound). .

d. Defendants submitted false claims on behalf of services performed by the physicians employed by ICR.

e. Defendants submitted false claims and made false statements through ASC X 12 837 electronic forms, CMS-1450s, CMS-1500s, CMS-2552-96s, CMS-2552-92s, and other forms and submissions.

155.   BDH and AMI submitted these false claims knowingly and willfully.  BDH's purpose in soliciting and receiving this remuneration was to limit competition in Bozeman and Gallatin County by agreeing to send a set number of patient referrals to AMI in order to keep the rest for itself.  Both BDH and AMI knew that this arrangement was illegal because ICR raised significant concerns during the negotiations.   However, BDH elected to ignore those concerns and the law because of its desire to maintain control over imaging services in Bozeman and Gallatin County.

## **CLAIMS FOR RELIEF**

### **First Cause of Action: Presentation of False Claims in Violation of 31 U.S.C. § 3729(a)(1)(A) and Mont. Code Ann. § 17-8-403(1)(a) Against BDH and AMI**

156.   Relators repeat and reallege the proceeding allegations as if fully set forth herein.

157.   BDH and AMI knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

-49-

158.  AMI submitted claims for payment to the United States by submitting Medicare claims to the Medicare Administrative Contractor, Medicaid claims to Montana Medicaid, and TRICARE claims to the DHA, which paid them with federal funds.

159.  BDH caused AMI to submit those claims for payment by referring patients to AMI for the provision of services.  BDH also submitted Medicare claims for payment to the Medicare Administrative Contractor, Medicaid claims to Montana Medicaid, and TRICARE claims to the DHA, which paid them with federal funds, for the services provided in BDH's own radiology department.

160.  By virtue of their violation of the AKS, those claims are false or fraudulent.  The claims submitted by AMI are the direct result of referrals made by BDH in violation of the AKS, and every claim submitted by AMI is false as a matter of law.  Furthermore, the claims submitted by BDH for outpatient services in its own radiology department are also false because it was BDH's decision, as the entity that controlled all scheduling, whether to send the patient to AMI or to BDH.  That decision is part of the kickback scheme with AMI.  Thus, outpatient services that BDH elected to retain for itself are tainted by the kickback scheme—they may have been lost without

it—and every claim for outpatient imaging services submitted by BDH is false as a matter of law.

161.  These claims are false as a matter of law because the AKS, at 42 U.S.C. § 1320a-7b(g) and as interpreted by numerous judicial decisions, provides that claims "includ[ing] items or services resulting from a violation of [the AKS] constitute[] false or fraudulent claim[s] for purposes of" the FCA.  These claims are also false because, in their Medicare enrollment applications (forms CMS-855A and B) and cost reports (forms CMS-2552-96 and -92), both BDH and AMI falsely certified that they complied with the AKS when providing and requesting payment for services.

162. BDH and AMI acted knowingly under the FCA by ignoring warnings from ICR's attorney that the arrangement was suspect and by deliberately structuring their arrangement to tie the valuation of the joint venture to the volume of referrals made by BDH.

163.  By virtue of the false or fraudulent claims made by BDH and AMI, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act and the Montana FCA, in an amount to be determined at trial, plus a civil penalty of not less than $5,500 and not more than $11,000 for each claim submitted.

**Second Cause of Action: Making or Using a False Record or Statement Material to a False or Fraudulent Claim in Violation of 31 U.S.C. § 3729(a)(1)(B) and Mont. Code. Ann. § 17-8-403(1)(b) Against BDH and AMI**

164.  Relators repeat and reallege the preceding allegations as if fully set forth herein.

165.  BDH and AMI knowingly made, used, and caused to be made or used false records or statements material to a false or fraudulent claim.

166.  Both BDH and AMI made and used Medicare and Medicaid enrollment applications and annual cost reports in which they made statements that they complied with the AKS when providing services to Medicare and Medicaid patients and submitting claims to the United States.

167.  These records and statements are false because, by virtue of their agreement to exchange patient referrals for membership interests and distributions, they have violated the AKS.

168.  These statements are material to the claims for payment they submitted to the United States, as compliance with the AKS is a condition of payment and has a natural tendency to influence the United States' payment decision.

169.  BDH and AMI acted knowingly under the FCA by ignoring warnings from ICR's attorney that the arrangement was suspect and by

deliberately structuring their arrangement to tie the valuation of the joint venture to the volume of referrals made by BDH.

170.  By virtue of the false records and statements made by BDH and AMI, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act and the Montana FCA, in an amount to be determined at trial, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation.

## **PRAYER FOR RELIEF**

Relators, on behalf of the United States, pray:

(a)   That this Court enter judgment against BDH and AMI in an amount equal to three times the amount of actual damages the United States Government and the State of Montana have sustained due to their actions, plus a civil penalty of $5,500 to $11,000 for each violation of 31 U.S.C. § 3729, a civil penalty of up to $10,000 for each violation of Mont. Code Ann. § 17-8-403, and the costs of this action, with interest, including the costs of the United States and the State of Montana for their expenses related to this action;

(b)   That Relators be awarded all costs incurred, including reasonable attorneys' fees;

(c)     That, in the event the United States Government and/or the State of Montana takes over this action, Relators be awarded, for bringing this action, an amount of at least 15% but not more than 25% of the proceeds of the action or settlement of the claim;

(d)     That, in the event the United States Government and/or the State of Montana does not proceed with this action, Relators be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall not be less than 25% nor more than 30% of the proceeds of the action or the settlement;

(e)     That Relators be awarded prejudgment interest;

(f)     That a trial by jury be held on all issues; and

(g)     That the United States Government, the State of Montana, and Relators receive all other relief, both in law and in equity, to which they may reasonably appear entitled.

DATED this 5th day of July, 2017.


 /s/ **Ben Alke**
J. Devlan Geddes
Benjamin J. Alke
Goetz, Baldwin & Geddes, P.C.
35 North Grand
P.O. Box 6580
Bozeman, MT 59771-6580
Tel:   (406) 587-0618

Fax:  (406) 587-5144
Email: balke@goetzlawfirm.com

Attorney for Relators

## JURY DEMAND

Relators demand a trial by jury on all issues so triable herein.

 /s/ **Ben Alke**
J. Devlan Geddes
Benjamin J. Alke